Good morning and may it please the Court. Jackie DeLauro for Blake Charboneau. Your Honors, this case presents a straightforward application of United States v. Antone, and this Court could reverse on that basis alone. But the District Court's analysis also suffers from a more fundamental error. Because it committed as sexually dangerous, someone whom all experts agree does not presently suffer from a sexual fixation, none of them diagnosed him with a paraphilic disorder. This Court should reverse for either or both reasons. Starting with Antone, this case is on all fours with that one. But Mr. Charboneau? Does the plain reading of the Walsh Act support an argument that a paraphilic disorder is necessary? Your Honor, I believe it supports this Court's holding in Caporal that a sexual fixation is necessary. And irrespective of whether... Well, that wasn't exactly my question. You had said that he also did not suffer from a paraphilic disorder, so that was what my question was. That's correct, Your Honor. No expert in this case diagnosed either... Let me repeat my question, okay? Does the plain reading of the Walsh Act support the argument that a paraphilic disorder is necessary? No, Your Honor, and that's what this Court held in Caporal. That's what I was trying to understand. So you're relying on the absence of a sexual fixation? That's correct. And neither was diagnosed in this case. Mr. Charboneau has had even better contact than did Mr. Antone and for a longer period of time. Like Mr. Antone, Mr. Charboneau has not had an act of sexual misconduct in the last 15 years. He has not had a drop of alcohol in the same span. Like Mr. Antone... He's been in prison the entire time. That's correct, Your Honor, and that was Dr. Phoenix's analysis in Antone, and the Court rejected it, saying that, you know, she believed that it was more important what someone's conduct was like in the community than it was in the controlled environment of prison. The Court rejected that, saying that you cannot focus exclusively on past conduct, especially when it's 15 years in the past. But in this case, we have a prior episode of essentially the same thing. We had a prior imprisonment where there was good conduct, and while on supervised release, your client committed the last of the sexual offenses. That wasn't present in Antone. Also, the District Court relied on that, and I think the District Court relied also on activity during treatment, including his admission or statement that he was sexually dangerous, and his statements about lack of responsibility concerning his sexual conduct, and we didn't have any of that in Antone, did we? Your Honor, I'd like to start with the second two parts of your question first, if I might. Mr. Charboneau suffers from a very severe expressive disorder. He has a very hard time expressing himself. I would note also that in Antone, the Court recognized that admitting that you have a problem is the first step in many treatment programs, including Alcoholics Anonymous and sex offender treatment, and so I don't believe that Mr. Charboneau's acknowledgement to his treating doctor at Butner weighs against him. I think it, in fact, weighs in favor of the fact that he understands. But I think the question, if you could just sort of stick with the question, I think the question was, is that not a point of your argument that it's a point of distinction in his favor? I think, though, the question was just, your initial argument is that Antone controls, and I think the question was just, aren't there actual points of distinction? There are some points, there are some points of distinction, Your Honor, but I do think there are some similarities even within those distinctions, which is acknowledgement of having a problem. And I didn't mean to interrupt. I mean, you were in the midst of answering Judge Quattlebaum's question. I was just trying to see if I could get us back on track with respect to that question. Thank you, Your Honor. And with respect to the first part of your question regarding supervised release, that is true that it is a point of distinction, but in Antone, he had had involvement by the criminal justice system prior to his present term of incarceration. So I think the point had been, in part, there was involvement of the criminal justice system in Mr. Antone's case prior to his most recent period of incarceration. So he had already suffered. By definition. He had had prior convictions and served time prior to his present term of incarceration. And so to the extent that the court's argument was that he had not been aware that what he was doing was a problem or was not sort of on notice in that respect, that was also present in Antone's case. And it was 15 years ago. I wasn't trying to make an argument. I was just trying to see how we can look at those two facts together. And it was less about his awareness and more about a distinction where the period of good behavior in prison was not enough the first time he was in prison and had good behavior. And the Yes, that's right. And I would also note that the seriousness of the past offending is not a point of distinction because Mr. Antone had committed six sex offenses, three of which were forcible rapes. And so to look... He did receive lesser sentences. That's true, Your Honor. But I also wanted to note that unlike Mr. Antone, Mr. Charbonneau enrolled in sex offender treatment at Butler. I'd also note that Mr. Antone was only 41 when this court ordered that he be released. Mr. Charbonneau is 59. I thought the expert testimony discounted the fact that age is an immutable factor. Did it not address that? All four doctors acknowledged that age of 60 is significant. The district court said that that was not a mitigating or protective factor in this case. But I think that that is contradicted by the forensic science and Dr. Plott's testimony that at the age of 60, the rate of re-offense declines precipitously. Yes, I understand that. My point is that the district court considered that and responded to it. The district court did consider it. But I would point again to this court's decision in Antone because the court did not remand for further fact-finding. It did not find that there was some sort of procedural error in the way the district court had analyzed the factors. The Court of Appeals remanded with instructions to dismiss the petition, which suggests that in a case like Antone's, which I believe this is, there is no amount of reasoning that could have reached a result that Mr. Antone should have been committed. And I think the same is true here. But don't we have it, in essence, we have a statute that, I won't go through it, you're familiar with the plain words, and we have, even without Dr. Zinnick's testimony, which the court found to be credible after looking at all the, and hearing all the witnesses live, even without that, you find, you have three experts whose qualifications don't seem to be in dispute who testified that the alcohol order alone provided a sufficient nexus under the test. And I know you disagree with that, but a district court heard those experts whose qualifications were not contested and found that they meet the test, and the plain language of the statute doesn't seem to make that an improper application of the test. Why is that not something that is within the discretion of the district court, who saw these witnesses live? Your Honor, I would note that in Antone it was also two treating, two expert witnesses against one, and the Court of Appeals nonetheless remanded with instructions to dismiss. I understand Antone, and that may find us, we may decide that. But without that, isn't this just a fairly normal, I mean that's a very serious matter, I'm not trying to take it lightly, but isn't it a fairly standard situation where the fact finder looked at the witnesses and found three had credible basis for those opinions? The district court is entitled to great deference in the ordinary case, but as in Wooden and as in Antone, when the district court's decision goes against the clear weight of the evidence... But you keep relying on Antone when you think it helps you, and yet there are significant distinctions. There were four witnesses to one, not two witnesses. You sort of elide the difference when you say, as in Antone, there were two witnesses against one, and yet there are double evidence. Standing on its own, it appears that the district court credited the testimony of the four experts that he had a severe alcohol use disorder and would have significant inability to refrain from reoffending. Your Honor, just to clarify, there were three experts against one in this case. It was Dr. Ross, Dr. North, and Dr. Zinnick, and Dr. Plod testified in Mr. Charbonneau's favor. Dr. Holden, I believe, was his treatment provider, and that was the individual to whom he acknowledged that he felt it was sexually dangerous? Dr. Holden is his treating physician, treating therapist at Butner. Your Honor, I would also note that Mr. Charbonneau will have two years of supervised release upon his release from the Bureau of Prisons, and that release includes some very onerous conditions, including that he may not use any alcohol whatsoever, and he has to enroll and maintain a presence in sex offender therapy. What were the terms and conditions after his release from his prior incarceration? Do you know? Yes, he did also need to refrain from alcohol. It's beyond dispute that he did violate his term of supervised release. You're saying that the terms of supervised release are onerous, and I understand that, but they were equally onerous when he was released from his prior incarceration. Yes, Your Honor, and again, that was 15 years ago, and I think the lesson of Antone is that Mr. Charbonneau has gained skills in the last 15 years. Wooden and Antone both talk about the grip strength of a mental disorder, and the extent to which a disorder controls someone's conduct, and there was testimony at the hearing that Mr. Charbonneau knew there was alcohol available in the Bureau of Prisons, but he hasn't availed himself of that. He hasn't sought it out. He hasn't made it. He hasn't looked for it, and that's significant, because someone who is truly suffering from alcohol use disorder to a level that he's unable to control his behavior would not be able to refrain from drinking for 15 years, would not be able to refrain from sexual misconduct for 15 years, and the government makes much of the fact that it believes there are no women in prison, and that is somehow what's protecting Mr. Charbonneau, but there are women at Butner. In fact, Mr. Charbonneau's treating therapist, Dr. Holden, is a woman, and we have had cases where individuals manifest their sexual fixation in ways other than hands-on sexual offending. They collect pictures. They write stories. They write to contact prior victims. They engage in masturbation in front of female employees of Butner. These are cases that the court has had. I would note also with respect to the second argument and the second reason why this court could reverse that a sexual fixation, we know from Caporell, is required. The text of the statute is aimed only at sexually dangerous persons and only those who will have serious difficulty refraining from two very specific types of conduct, sexually violent conduct and child molestation. And because neither alcohol use disorder nor a personality disorder has generally an element of sexual fixation, nor does it specifically have such an element in Mr. Charbonneau's case, as is reflected by his 15 years of clear conduct. But even if they could qualify, they don't qualify here because the necessary causal link is missing. I would note that in his younger years, Mr. Charbonneau... I read this record as that your client was, that alcohol was of course a causal link. That as soon as he got out and drunk, he committed sexual assault. I don't believe that. I'm just telling you where that's wrong. That's why in prison, without alcohol, no problem. I don't believe that's supported by the record, Your Honor. The record reflects that in his younger years, Mr. Charbonneau was drinking a lot. Just because a crime was not discovered didn't mean it didn't happen. I don't know if you have any children. There are lots of things going on that you don't know about, right? Your Honor, the district court noted 20 non-sexual petty offenses he committed while intoxicated, and he was admitted to North Dakota State Hospital 11 times before his 26th birthday. The record was pretty clear that these quite dreadful sex crimes that he committed were all committed while he was drunk. They were, but there were four in number over the course of 59 years of his life. And if it were such a grip strength that every time he had a drink, he was sexually offended... It's very hard for me to listen to you sort of minimize sexually violent conduct against one's daughter. You know, I understand what you're saying, but I think you do need to come to grips with the nature of the sexual... of the very violent sexual behavior in which he engaged in, saying, well, it was only four times that we know about. I'm not sure it gets you very far. Your Honor, I do not intend to minimize any of the offenses. But I do think it's important to note that Mr. Anton's offenses were also incredibly serious. There were three forcible rapes and six victims from age 11 and up. And so the fact that serious offenses happened in one's past relate to the first prong of the statute. Isn't the causation prong that you're talking about now also something that's proper for expert testimony? I mean, your client offered expert testimony on that, correct? And the government offered expert testimony on that, correct? And the fact finder looked at those two things and found that the three experts who testified contrary to the way your expert did were more credible. That's what we have here, right? That's correct, Your Honor. But as in Anton, the causation link, if the expert testimony suffers from an inherent, embedded, fundamental problem, this court need not credit it. Exactly. What's the fundamental problem that you think the testimony regarding the effect of alcohol on Mr. Charbonneau has? As in Anton, that the district court did not give adequate consideration to the last 15 years of Mr. Charbonneau's life and his ability to refrain both from alcohol and from sexual misconduct while in the Bureau of Prisons. I would note also that the Supreme Court has confirmed that the grip strength of the mental disorder, this ongoing volitional control problem, is constitutionally required and that those who do not suffer from this kind of volitional impairment problem are best left and constitutionally required to be left to the criminal justice system. Would you be comfortable with a remand to allow the district court to consider the effect of the 15 years without resorting to alcohol? We would certainly appreciate a remand, Your Honor. On that point? On that point, I don't believe it's necessary in light of what the court did in Anton, which is remanded to dismiss petition. Didn't the district court consider that quite significantly? The district court considered that and said that was a factor, but the prior instance of incarceration outweighed that, along with other activities that happened in recorded interaction during those 15 years. The district court did consider it, and that's why we asked for outright reversal, because I believe it is structurally similar to Anton in that any sort of procedural error could not be corrected by the district court, that there was a more substantive problem. Well, you just told me that you would be satisfied with a remand to the district court to give adequate consideration to abstinence on the issue of causation by alcohol. Yes, Your Honor. If the court believes that further discussion would be helpful. I'm sorry. I may have misunderstood. I thought you just said that that would not be appropriate. In response to my colleague's question. May I respond to that? Sure. Thank you. I don't believe it's necessary, but if the court. No, I believe you said you didn't think it would be appropriate because the district court had already considered it. Did I misunderstand? I believe that the district court has considered it, but inadequately and in a way that could not be remedied by remand. If this court disagrees with me and believes that further discussion could cure the error, we would, of course, be happy to go back to the district court. Thank you. Thank you, Your Honor. May it please the Court. My name is Michael James, and I represent the United States in this matter. First, let me address Anton since that was the first point raised by the respondent. There are significant differences between this case, Charbonneau's case, and Anton's case. Judge Quattlebaum highlighted some of those differences. First, I'd like to begin by talking about a few of the deficiencies in Anton that were not present in this case. In Anton, after reading the opinion of the district court in Anton, the court could not understand how the district court had reached its decision. That's, I believe, one of the key problems in Anton. Here you have, in this case, the court's opinion is 61 pages. Yes, yes, yes. That's true. But if you lay the facts that we know in Anton against the facts here and what was happening, I gather from Anton, whether it is right or wrong, it's now circuit precedent, that there has to be, the district court had to give weight to in-prison records. The in-prison record of Anton and the in-prison record, going forward, of all other people in Anton's position. That was the fundamental error that was made by the district court there. Yes. And I understand that the district court here acknowledged some things that happened, but whether it gave the weight that Anton seems to regard as crucial seems to be a big issue in this case. Maybe you can speak about that, because I understand that in Anton there was a magistrate judge's report saying that Anton should be released, and then the district court, the very summary opinion reversed, and so the court circuit couldn't make a lot of that. And we don't have that here. Instead, we have a very full opinion by the district court following a very full hearing before the district court. I understand there are those differences. Talk to me about the difference that I asked you about. Well, the district court did consider his conduct. We're talking about in-prison conduct, which, I mean, I think that if you were in front of us in Antwon, you would say, well, that doesn't make any difference. That's a controlled atmosphere. But the court circuit rejected that, and we're just a panel. We're just trottling along after the glass panel. I understand that, Your Honor. In this matter, the court acknowledged that Mr. Charbonneau had, during the current term of imprisonment, had good conduct. But the court also, and this is significant, the court also relied heavily on his treatment provider, whom Mr. Charbonneau admitted he is sexually dangerous. That is a factor that – I'm sorry. I was going to say that is a factor that, in considering Antwon, looking at the conduct in prison, looking at a factor that could overshadow that. We believe that his – But, you see, the thing is, for any kind of treatment, the first thing that you do when you go to AA is to confess that you have a problem. So I don't see that that cuts against the man here. I think it helps him, helps his case that he acknowledged he had a problem. Well, my colleague had a question. Sorry. I think I'm asking Judge Montes' question in a slightly different way. So maybe this can help focus, because it's my question. On this record, we have Antwon. On this record, given Antwon, what more could Mr. Charbonneau have done? I think that's Judge Montes' question. It is also my question. What more could Mr. Charbonneau have done to create an argument to support his release? What could he do, on this record, that he didn't do? Because if you prevail, we're going to keep him in prison. Presumably at some point we'll look at it again. What will have changed if he's been in prison? Well, what may have changed is that – He may have aged out. Is that it? No. Well, I can't say how long it would take him to complete the treatment phase. I know that although he is 59, as this court held – or noted, I should say, in the Caporale case, when you turn 60 you don't magically become less sexually dangerous. Right. It's an individual assessment. It's a very individualized assessment, each of his cases. Do you have any more other than the passage of time? Well – Which, as you point out, does not automatically exist. That is my fundamental question, on this record. What can he do that – What could he do to demonstrate that he's in a better place? Well, first, as he goes through treatment, and this was noted by Dr. Holden, he would not minimize or rationalize his crimes. That was one of the – I'm sorry. Admitting that he needs treatment and that's the first step for that, but yet you're holding that against him. Well, I think what you're saying is he tries to minimize the nature of it. He says, I'm sexually dangerous, but he doesn't seem to recognize – The court points out that he doesn't seem to recognize how severe – His offenses were. His offenses were. Against his own daughter. Exactly. He has rationalized very serious offenses. Minimize them. Isn't this record undisputed that this is a person with extreme difficulties communicating? Well, as the district court heard the evidence, the district court heard his treatment provider who had developed a therapeutic alliance with him. She took the time, I believe it was in her testimony, to speak with him. She understands his rhythm, and so she's able – that is why the district court credited her testimony over that of Dr. Plot, who said, well, because Mr. Charbonneau has expressive difficulties, I'm going to discount the fact that he made an admission that he's sexually dangerous. The treatment provider is the person who is with him frequently, speaks with him frequently, understands the rhythm of his speech, and was able to communicate with him, and he developed a trust in her to tell her that. And so part of Dr. Holden's testimony was that Mr. Charbonneau had rationalized and minimized his crimes. That was in December of 2016. So unlike the Antone case, you have the district court not only considering Mr. Charbonneau's good time in prison, also considering his current mental state as per the testimony of the treatment provider whom he has developed that sort of an alliance with. I do understand, and you're relying heavily on that. And as I say, I think that confessing to a treatment advisor or to an AAA group that you have a problem is the first step in getting treatment. So I don't find that as compelling as apparently you do. So other than that, what more could he have done? I guess your answer to Judge Duncan was – so many women now, so great – your answer to Judge Duncan was what he could do is to talk more with his treatment advisor and get her to give him a good recommendation. That's the only thing that he could do. No, that was not my – It's not just admitting the label. He admitted to the label, and that shouldn't be held against him. But what should be considered is what he did with respect to that label. That's correct. And that is to play down the significance of his act. That's correct. And not to come to grips with the – which is distinguished, which is distinct. Right. A person with limited communicative skills might never get to that position. Well, Your Honor, I could not say that. We could not say that. I know we cannot say that, but that might be so. Yes, that might be so. So he's there forever. Is there anything else he can do in prison to get himself released? If Mr. Charbonneau completes treatment and internalizes it so that he understands. That's the same answer. Is there anything else? He has a perfect record. He has a better record than his predecessor in the case in which we're trying to distinguish. Right. Right? Well, Your Honor, again, if he goes through treatment and he internalizes and understands why he was so sexually dangerous, if he internalizes that, then he should be released. The Adam Walsh Act, as I understand it, Your Honor, was not only to provide treatment for people with sexual dangers, but to protect the public. So if Mr. Charbonneau does not internalize it, remains dangerous. When you say internalize, are you saying if he acknowledges the gravity of what he did? Understands the gravity of what he did, understands the triggers that he has, and works towards ameliorating it, then he should be released as he completes the program. But, you know, just saying that makes it sound really easy. We don't have an X-ray into somebody's mind and heart, do we? I understand that, Your Honor. People that are articulate can say, fool us. People that are inarticulate may never be able to have that opportunity one way or the other. Yes, Your Honor, that is true. However, again, looking at the focus of this statute for the protection of the public, the focus of the statute is not just to provide treatment for people who are sexually dangerous, it is to protect the public. And if protecting the public and it's been constitutional from cases from Kansas v. Hendricks, Kansas v. Crane. Let me ask you something else. We know it's a constitutional statute. I think we're talking about what it has to do. Let me ask you about another issue, the causation prong of the statute. I appreciate there's expert testimony. You heard my questions about that earlier. But from an authority standpoint, has anyone else in a circuit court situation ruled or addressed on whether alcohol disorder without the type of sexual disorder would be sufficient to satisfy that prong? No, Your Honor. And why has that been not appropriate as a matter of law for us to evaluate, as opposed to being something that we look at from an abuse of discretion standpoint? Well, Your Honor, of course the court can evaluate it. What I would point out, Judge, that with regard to the plain text of the statute, 4247-86 does not require a paraphilic disorder. That is one of the heart of the argument, aside from the Antoine argument, made by the respondent. The plain text of the statute, it does not require it, and for good reason. The Supreme Court in Kansas v. Hendricks, 521 U.S. and 357, upheld the Kansas sexually violent predator statute, which talked about mental abnormalities and personality disorders. So the Supreme Court has never required that the disorder be a paraphilic disorder. It has affirmed a Kansas statute that involved a personality disorder and just what they termed mental abnormalities. Judge Claiborne's question to you wasn't quite that. His question was, what's the standard of review? And surely we will look at that de novo. We don't give any deference to anybody else on that. The legal question. Well, the court, we believe it is a clear error review, Your Honor. The standard review is for clear error. Is that a legal question? No, no, no, that's correct. It's a de novo legal question. So what would be the legal question? I'm sorry, Judge. You don't think this is a legal question? No, it is a legal question, Your Honor. So? It would be de novo. Yes, it would be de novo. By citing Kansas v. Hendricks, my point in citing that was to point out to the court that what the respondent is asking this court to do is to do something that the Supreme Court has not done, which is to find that it is required under the Adam Walsh Act, or essentially a civil commitment law, statute, that the act required a paraphilic disorder. So our job would be to interpret what the statute, or say what the statute says. Once that is done, it's the fact finder's job to weigh the evidence as to where it meets that. Is that how we should look at this? Yes, Your Honor. Okay. Now, the defendant makes a strong case and a strong argument about the absence of authority. I understand the text doesn't require a sexual abnormality per se, but that there's no authority from the Fourth Circuit, the Supreme Court, or anywhere that would look at this type of disorder and find that it meets the causation test. Do you acknowledge there's no such authority one way or the other? Well, let me be careful about that. This Court, even in Caporal at Note 4, pointed out that in Caporal, of course, it was about hemophilia, but in looking at the thrust of the district court's inquiry is the thrust of the impairment. At Note 4, this Court noted in talking about hemophilia, then it said in parentheses, paraphilia, comma, other mental disorders. So even in reviewing Caporal, this Court looked at the thrust of the mental disorder. That was the heart of it, not just the fact that it was a, whether it was a paraphilic disorder or not. This Court has looked at that, has acknowledged that it can be more than just a paraphilic disorder. Could I just add, I actually thought, I actually found your answer to, just not to see my kind of joint question, to move the ball a little bit, but I wanted to verify something, if you can, from the record. Did the district court consider the fact that Charbonneau's apparent establishment of rapport with the treating physician, Dr. Holden, and the fact that he could communicate with her, did the district court discuss, acknowledge, or rely on that in any way to address Charbonneau's extent, Charbonneau's ability to overcome his expressive difficulties? I know that was a terribly clear question, but I understand what you're saying. I take what you're saying to be, it's not just the fact that he admitted he was sexually dangerous, it's the fact that he has never internalized in your word, or recognized the gravity, nature and gravity of his offense, in my terminology, and he has these expressive difficulties, which would make it probably difficult for him to do so, but does the district court, to your knowledge, ever address the effect that the rapport you apparently established with Dr. Holden was sufficient to overcome those difficulties? Did the district court look at that at all, to your knowledge? To my knowledge, the district court did. I can find it. It expressly stated that it relied on Dr. Holden's testimony, credited Dr. Holden's testimony with regard to her communications with the respondent over Dr. Plaut's, stating that, well, because Mr. Charbonneau has neurocognitive deficiencies, you can't count on what he says. So the district court did consider that. It did consider Dr. Holden's testimony, credited that over Dr. Plaut's testimony on that issue. Thank you. If there's anything else, we would ask that this court affirm the district court's decision, and because this is an issue that has occurred and may come up again in our unique district, because the Eastern District of North Carolina handles all of these civil commitment cases, these sort of issues will come up again, whether it's a personality disorder, perhaps, or another case involving alcohol use disorder. So we'd ask that in this unique case that the court affirm the district court's opinion and that it be a public opinion. Thank you, Your Honor. Before you sit down, so the district court issued its opinion on September 28, 2017. That's correct. When can Mr. Charbonneau, when is he, how frequently, I've forgotten, does he get reassessed? The review period is six-month intervals. After the first, well, after the first time he's been civilly committed, that's when he could move for review hearing. Reports, annual reports are always done in these cases. I reviewed Mr. Charbonneau's most recent annual review report last night. What about once the next time he can seek review? At what intervals? Well, he can actually seek review after the first 180 days, because before the first 180 days you can't seek review. After 180 days, there isn't a, as my understanding, a limitation as to when he can do it. He's currently still in phase two of the program from the last annual review report that I viewed. Thank you, Your Honor. Thank you, Your Honor. As the court well knows, the Adam Walsh Act requires three prongs of analysis. The first focuses on the past, the second on the present, and the third on the future. Without minimizing or diminishing the seriousness of the offenses in Mr. Charbonneau's past, I do think it's important to ask the question that Your Honor has asked of my colleague, Mr. James, what more could he do? And when Mr. James responded that he could demonstrate some understanding of the seriousness of his offenses, I think in light of Mr. Charbonneau's communicative difficulties, his testimony is really compelling. Well, he responded to that as I understood it, and I'm going to have to go back and look at the record, but I do recall that there was some recognition of the extent to which Dr. Holden was successful in communicating with Mr. Charbonneau. There was. And this is the person to whom he acknowledged or he said he was sexually dangerous and to whom presumptively he would be willing to communicate about recognition of the significance and the gravity of what he did. And I think it was Dr. Holden who said that he never did that. He rationalized it and tried to pretend that it wasn't nearly as serious as it was made out to be. I would point the Court to Mr. Charbonneau's testimony at the hearing. If you could just stay with me on my question, though. I mean, I understand that you're making the point, but I'm trying to sort of understand in the context of what's bothering you. Yes, Your Honor, and to respond to that, I believe that Dr. Holden's testimony that he did not take full effect, full responsibility for his conduct is contradicted by his testimony. Conflicts in testimony are the things fact-finders look at. Judge Duncan, I think, is trying to get the point that one of the issues that you've raised, and I think it's a very legitimate point, that one of the issues he's raised is his cognitive difficulties. But those could be overcome by a doctor with whom he has a more longstanding relationship. And that was part of the record below. And to that doctor who he had a more longstanding relationship, he said things such as, I don't yet minimize the significance of these offenses. He also said it to Dr. Ross, too, so he said it to multiple occasions. But one to the doctor with whom he had the most longstanding relationship and therefore presumably the best ability to communicate with. I think that's what we're trying to get at. He does, though, have this significant problem where he conflates words. You're not answering the question. The question accepts the fact that he has cognitive difficulties. I don't think anybody's challenging that he has cognitive difficulties. The question is, to the extent that he has established this rapport with Dr. Holden, Dr. Holden would be the person with whom he could best overcome those sufficient to communicate his acceptance of the gravity of his offense. That was my question. And it's not a trick question. I'm just trying to ñ this is an issue that bothers me, and I'm trying to understand it. Your Honor, I would just note Dr. Holden's testimony also that Mr. Charbonneau was doing well in treatment at JA 50 and 55, and that that is in conflict with her testimony. I think our problem is you don't answer first. You're certainly entitled to say what goes the other way, but I guess your answer to my colleague's question is yes, Dr. Holden testified that she had the greatest rapport, and yes, the district court was entitled to deduce from that that maybe he would be able to overcome his difficulties in talking to her, but, and then you want us to look at the record where he testified, and now you're about to tell us something else about Dr. Holden. Is that right? Yes, Your Honor. I got that all right? Yes, Your Honor, and I would also note that ñ What is that something else? Because you wanted to get out this other thing. I just wanted to point out that Mr. Charbonneau testified, I don't want to hurt another individual. I don't want to cause no more harm. I'm ashamed of what I've done already. Okay, and what did Dr. Holden testify about her rapport and whether she would be able to work with him notwithstanding his cognitive disability? She testified that Mr. Charbonneau was doing well in the commitment and treatment program, and that's also supported by the recent report. It's not in the record before this court, but Mr. James and I have both reviewed it, that reflects that he is still enrolled in sex offender treatment and doing well and still has not had any instance of sexual misconduct or any alcohol use while in prison. Do we know if any of these experts have changed their views in the two years that's gone by? There has not been any reopening of the hearing at this point, Your Honor, so I don't believe those experts have been consulted about Mr. Charbonneau's current status. And what about Dr. Holden? This is his treating person. Do you know if she has any new views? I don't believe that that's been explored, Your Honor. But the district court did note that Dr. Holden's relationship withó the district court did note that Dr. Holden had a special relationship with Mr. Charbonneau and sort of verified that what she sent back to him was indeed what he meant. It did, Your Honor. And I would just note that this court's review, clear error review, is not toothless, and the court can view the evidence in its totality. And if the district court's decision goes against the clear weight of the evidence, as the court did in what it didó I completely understand that. Thank you. Thank you, Your Honor.  We will condone the brief interviews and the direct questioning of Mr. Charbonneau.
judges: Diana Gribbon Motz, Allyson K. Duncan, A. Marvin Quattlebaum Jr.